IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.                                                    CRIMINAL ACTION NO.: 2:11CR11-SA

LEONEL LUJAN                                                              DEFENDANT

MEMORANDUM OPINION

Defendant Lujan filed a motion to suppress evidence derived from a stop of his vehicle and dismiss the indictment. A hearing was held on January 6, 2012. The Court requested and received supplemental briefing. After such briefing was received, the United States Supreme Court handed down a seminal case on an issue relevant to this suppression motion. The parties submitted additional briefing. A second hearing was held, and the Court reviewed supplemental arguments from the defendant. Accordingly, after reviewing the briefs, hearing transcript, applicable case law and authorities, the Court grants the motion in part and denies the motion in part:

*Factual and Procedural Background*

Following an extended investigation of alleged narcotic trafficking activity, which included wire tap and pole camera surveillance, DEA Agents placed a GPS tracker on Leonel Lujan's vehicle and monitored his activity for approximately six days. Lujan was subsequently pulled over for a traffic violation in Arkansas, his vehicle was searched, and $83,000 worth of currency was found secreted in a motor trap. Cash in the amount of $2500 was also recovered from a backpack in the vehicle. Lujan's cell phone was seized and the information downloaded at the time of the search.

Lujan was indicted with six others for conspiracy to possess with intent to distribute cocaine hydrochloride. He now seeks to suppress all evidence seized from the warrantless search of his vehicle, including the contents and information found on his cell phone. He also contends that the Government's use of a GPS tracker and consequential surveillance was a violation of the Fourth

Amendment.

*Discussion and Analysis*

The Fourth Amendment protects against illegal searches and seizures. U.S. CONST. AMEND. IV. The United States Supreme Court has held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (footnote omitted). When a warrantless search or seizure is challenged, the government bears the burden of establishing its validity by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) (the burden of proof at suppression hearing should be no greater than proof by a preponderance of the evidence).

Lujan asserts that the evidence seized from his vehicle should be suppressed as the placement of a GPS tracker on his vehicle was unconstitutional. He further contends that the Arkansas traffic stop was unjustified at its inception as officers lacked reasonable suspicion to make a traffic stop and had no probable cause to prolong the traffic stop. Further, Defendant contends he had a reasonable expectation of privacy in the recovered cell phone information.

### *GPS Tracking*

The United States Supreme Court recently held that the a governmental "installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'" within the meaning of the Fourth Amendment. See United States v. Jones, 565 U.S. —, 132 S. Ct. 945, 181 L. Ed. 2d 911 (Jan. 23, 2012). A second hearing was held on May 29, 2012, regarding the GPS tracking issue specifically.

The Government insists that despite the Supreme Court's ruling that the warrantless placement of a GPS tracker is unconstitutional, the good faith exception to the Fourth Amendment prevents suppression of the evidence found. Citing United States v. Michael, 645 F.2d 252 (5th Cir. 1981), the Government contends that prior to the pronouncement in Jones, the Fifth Circuit recognized that the placement of a beeper without warrant was justified because the officers had reasonable suspicion that the defendant was engaged in criminal activity. This, the Government contends, established an objectively reasonable good faith belief that placing a GPS tracker on Lujan's vehicle on October 31, 2010, was not a search under the Fourth Amendment. Indeed, the Fifth Circuit has more recently provided that the use of a GPS device to track a defendant's movement is not an unconstitutional warrantless search. See United States v. Hernandez, 647 F.3d 216, 220 (5th Cir. 2011). However, that case was handed down after the GPS in question here was placed.

The Government cites to four post-Jones cases involving the applicability of the good faith exception in these circumstances for the Court's consideration.

First, the Government cites United States v. Leon, 2012 U.S. Dist. Lexis 42737, 2012 WL 1081962 (D. Haw. Mar. 28, 2012). There, the district court of Hawaii denied suppression of evidence seized from a vehicle tracked by GPS for four months. Because warrantless placement of the GPS tracker was "**specifically authorized** by binding Ninth Circuit precedent" at the time of placement, the search was conducted in objectively reasonable reliance on that precedent, and the good faith exception prevented suppression. Id. at *10 (emphasis added) (citing United States v. McIver, 186 F.3d 1119 (9th Cir. 1999)). The court alternatively noted that the officers' conduct in using the tracking device was objectively reasonable as the Ninth Circuit held that prolonged use

3

of a GPS tracking device was constitutional after the placement and tracking was complete. Id. at *14. The district court noted:

> This after-the-fact ruling provides further support that the agents acted with an objectively *reasonable* good-faith belief - - a court would be hard-pressed to place culpability on the agents for their actions in 2009 when, one year later, three judges of the Ninth Circuit relied on Knotts to conclude that the prolonged use of a GPS tracking device did not violate the *Fourth Amendment*.

Id. at *15 (citing United States v. Pineda-Moreno, 591 F.3d 1212 (9th Cir. 2010) and United States v. Hernandez, 647 F.3d 216 (5th Cir. 2011) (holding that the use of a GPS device to track a vehicle was constitutional)).

The district court of Montana, also in the Ninth Circuit, came to a similar conclusion in United States v. Heath, 2012 U.S. Dist. Lexis 62410, 2012 WL 1574123 (D. Mont. May 3, 2012). In the second case cited the by the Government, the district court refused to suppress evidence discovered as a result of the unlawful use of a GPS tracking device. The court, relying on binding Ninth Circuit precedent, held that the officers' good faith reliance on existing federal law exempted them from the ruling in Jones. See also United States v. Aguilar, 2012 WL 1600276 (D. Idaho May 7, 2012) (same).

The district court in United States v. Amaya, 2012 U.S. Dist. Lexis 50151, 2012 WL 1188456 (N.D. Iowa Apr. 10, 2010), held the exclusionary rule did not apply to evidence discovered as a result of the use of GPS tracking devices. Because both parties recognized that Jones applied retroactively, the court stated that the installation and use of GPS devices to monitor the defendant constituted a search under the Fourth Amendment. The court held

> Even assuming that the warrantless use of GPS devices to monitor [the defendant] violated the Fourth Amendment, the evidence collected from the GPS devices is not subject to the exclusionary rule because, pursuant to Davis v. United States, 131 S.

4

>Ct. 2419, 180 L. Ed. 2d 285 (2011), the good faith exception applies, as the agents here relied upon binding Eight Circuit precedent authorizing warrantless GPS surveillance.

Id. at *18. In making that determination, the court looked first to see whether binding appellate precedent regarding the use of GPS devises existed at the time of the search at the time, and second, whether the searches were conducted in objectively reasonable reliance on that binding appellate precedent.

The Eighth Circuit held, prior to the searches at issue in Amaya, that "when police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, a non-invasive GPS tracking device is installed for a reasonable period of time." Id. at *22 (quoting United States v. Marquez, 605 F.3d 604 (8th Cir. 2010)). After finding that the officers complied with each of the four elements of the Marquez precedent, the court found such reliance reasonable. Accordingly the exclusionary rule did not apply pursuant to Davis, 131 S. Ct. at 2423-24.

Here, the Court finds more persuasive United States v. Katzin, 2012 U.S. Dist. Lexis 65677, 2012 WL 1646894 (E.D. Penn. May 9, 2012), as no explicit determination as to the constitutionality of the placement of GPS trackers was made in the Fifth Circuit prior to the incidents here. Katzin involved GPS surveillance of a van driven by one of the defendants which evidenced a pattern relevant to a string of pharmaceutical burglaries. The district court noted that there was no "special need" that would obviate the need for a warrant pursuant to the Supreme Court's guidance in Jones as nothing in the investigation outweighed the intrusion onto the private property of the defendants. Id. at *18. The court discarded the theory of the good faith exception propagated by the Government as the Third Circuit had yet to formulate any caselaw regarding the warrantless installation and

monitoring of a GPS device. Id. at *25. Likewise here, the Fifth Circuit's standing precedent at the time the GPS tracker was placed was that the placement of a beeper, not specifically a GPS tracker, without a warrant was justified where the officers had reasonable suspicion that the defendant was engaged in criminal activity. Michael, 645 F.2d at 257-58. Accordingly, the Court finds that application of the good faith exception in this instance, where the Fifth Circuit precedent at the time the tracker was placed could only apply to GPS by analogy, is overly broad.

Because the evidence discovered by the Government was procured through an independent source, regardless of the legality of the GPS placement and tracking, the evidence is admissible. Evidence not obtained as a result of police illegality, but rather through a legal, independent source, need not be suppressed. United States v. Moore, 329 F.3d 399, 404 (5th Cir. 2003) (citing Murray v. United States, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988)). Under the independent source doctrine, if the "but for" test cannot be met such that the evidence would not have been found but for police illegality, then clearly the evidence is not a fruit of the prior Fourth Amendment violation. Id.; see also United States v. Oliver, 630 F.3d 397, 408 (5th Cir. 2011).

Here, although the placement and use of a GPS tracker in this instance was *per se* unreasonable without a warrant under the Fourth Amendment, because there was an independent basis for pulling Lujan over in Arkansas and separate probable cause (as well as valid consent) to search his vehicle, the evidence will not be suppressed.

*Reasonable Suspicion and Probable Cause*

According to Kyle Hodge, DEA Task Force Agent, an investigation was commenced in late 2009 to apprehend the main cocaine supplier for DeSoto and Tate County. In conjunction with a DEA investigation in Indiana, as well as cooperating defendants, Diego Loya was identified as a

6

possible source of supply. Wire intercepts were placed on phones of persons allegedly involved, and the DEA Task Force was alerted that Loya was expecting cocaine to be delivered October 29 or 30, 2010. Agents initiated surveillance on Diego Loya after this call was intercepted.

On October 31, Loya visited the DeSoto County EconoLodge at 5:00 a.m. to meet a hispanic male in a white Ford truck with Texas tags. Loya, and the male later identified as Leonel Lujan, drove in tandem to a storage building in Memphis. The white Ford truck pulled into the unit, and Loya parked behind. According to Hodge, the white Ford had its hood opened during the three hours it was parked in the storage unit. Both vehicles then left the storage unit. Agents followed Lujan into the Wal-Mart parking lot where a GPS tracker was placed on his vehicle.

A subsequent search of the storage unit revealed packaging for a star-bolt type ratchet commonly used to remove automobile motor parts, rubber bands, lists of added numbers, digital scales, leather gloves with grease on them, at least ten pounds of marijuana covered in grease, and a heat-sealed bag. Hodge noted that all of these items are commonly used in narcotics trafficking. Agents put everything back where it was found, and exited the unit.

Agents noted that a check of hotel guest registries evidence that Lujan stayed at the EconoLodge from October 31 through November 3, the Ramada Inn from November 3 through 5, and the Sleep Inn from November 5 through 6. Hodge testified that phone calls intercepted between October 31 and November 5 indicated that Henry Newson was attempting to locate money during the time that Lujan was staying in North Mississippi. When Newson's call indicated that he was "good now," agents interpreted that to mean he had come up with the money to purchase the narcotics, and that Lujan would be leaving Mississippi after he took possession of the money.

In anticipation of Lujan leaving the North Mississippi area to go back to Texas, DEA Agent

7

Don Douglas contacted the Arkansas DEA Agent to request that Lujan's vehicle be pulled over once he crossed into Arkansas. Hodge noted that, while the officers believed they had probable cause to search his vehicle in North Mississippi, they preferred to stop and search the vehicle away from the area under investigation in order to prevent the other alleged conspirators from learning of the surveillance. The Agent indicated to the Arkansas DEA Agent that there was probable cause to effect an intervention, but that the patrolling officer should develop his own reason to pull the vehicle over. Lujan's truck and tag information was relayed to Sergeant Dennis Overton of the Arkansas State Police

On the morning of November 6, Sergeant Overton was notified that Leonel Lujan's vehicle was on Interstate 20 heading toward his patrol position. Overton testified that prior to pulling out behind Lujan's vehicle, he observed, as well as heard, the white Ford truck cross the fog line and roll over the rumble strips located six to eight inches off the fog line. Overton's dashboard camera showed a white Ford truck veering over the fog line. Overton initiated a traffic stop.

Sergeant Overton noted that based on his numerous years involved in interstate drug interdiction, he developed probable cause that Lujan was trafficking narcotics or the proceeds thereof based on the following evidence: (1) Lujan was unsure of the name of the person whose vehicle he was driving, even though he stated his aunt was the owner; (2) Lujan only carried one backpack even though he indicated he had been visiting his sister in North Mississippi for several days; (3) the floor board was wet with what smelled like anti-freeze, indicating that the vehicle had recently been worked on; (4) the heater was not on making Overton suspect the truck had a mechanical malfunction due to the truck being tampered with; (5) the truck appeared to be overheating; and (6) the truck had a thirty day insurance policy, paid in cash, which is a common

8

trend among drug traffickers.

After indicating that he had no drugs or money in the truck, Lujan consented to a search of his vehicle. Overton searched Lujan's backpack on the front seat of the truck and found $2500 in cash, despite Lujan's assertion there was no money in the vehicle. Overton further noted that Lujan's cell phone was either on the seat or in the backpack.

Overton testified that in his experience as a drug interdiction officer, he was trained to identify when vehicles had been tampered with and where to find hidden compartments used to hide drugs or money tied to narcotic transactions. Based on his training and experience, Overton noticed that several bolts had been recently tooled and scarred. He noted that it was uncommon for seat and cab bolts to be replaced or removed normally, and based on that evidence, he concluded the seat and cab had likely been altered. Overton noted that the white Ford truck was pieced together, and in those situations, it was not uncommon for a trap to be built in the alterations.

Overton testified that in his training, he had been taught to look for out of the ordinary scarring on the automotive parts and bolts under the hood of a vehicle in looking for a hidden compartment. He noted that under the hood of the white Ford truck, the bolts on the motor were very shiny, there was a new gasket near the motor indicating it had very recently been worked on, and the firewall behind the motor had hand prints where no hand could reach without the top of the motor being removed. According to the officer, motor traps are becoming the trend in drug trafficking, and although he had never found one personally, he had been extensively trained in identifying and dismantling motor traps. He indicated that even without prior knowledge of the ongoing narcotics investigation involving this vehicle, he would have done exactly the same thing.

Once Overton noticed the alterations under the hood, he realized he would not be able to

9

disassemble the vehicle in order to locate the trap. Instead, he asked for and received permission from Lujan to put the truck on a rack at a mechanic's shop right off the highway for further investigation. At the shop, Overton noted that a star-type bolt was required to do the necessary disassembly. Once the top of the motor was removed, $83,000 in currency bound in silver duct tape was found in a hidden compartment in the motor. Also at the shop, Lujan's cell phone was turned over to an Arkansas DEA Agent who "dumped," or electronically downloaded the contents of the phone onto a computer.

Sergeant Overton effectuated an independent traffic stop once Lujan crossed into Arkansas. The Government proved by a preponderance of the evidence that even without the GPS coordinates of Lujan's vehicle, Overton was stationed on I-20 when Lujan's vehicle drove past, and a legal traffic stop was initiated once the officer determined a traffic violation occurred. Once he approached the vehicle, Overton developed sufficient probable cause that the vehicle was being used for narcotics trafficking based on his training and experience. Specifically, he noted that because the truck had clearly been tampered with, Lujan was not able to correctly name the owner of the vehicle he was driving on a cross country trip and back, as well as Lujan's thirty day insurance paid in cash, Overton believed the truck was involved in narcotics trafficking.

A warrantless search is permissible under the automobile exception if (1) the officer conducting the search had "probable cause to believe that the vehicle in question contained property that the government may properly seize"; and (2) exigent circumstances justified the search. See United States v. Castelo, 415 F.3d 407, 412 (5th Cir. 2005); United States v. Reyes, 792 F.2d 536, 538 (5th Cir. 1986). "Exigent circumstances" have been noted simply by the fact that a vehicle was traveling on an interstate highway. See, e.g., Castelo, 415 F.3d at 412; United States v. Sinisterra,

77 F.3d 101, 104 (5th Cir. 1996) (exigent circumstances are supplied by "the fact of the automobile's mobility").

Probable cause to search an automobile exists where "trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband." United States v. Edwards, 577 F.2d 883, 895 (5th Cir.) (en banc), cert. denied, 439 U.S. 968, 99 S. Ct. 458, 58 L. Ed. 2d 427 (1978). In determining whether probable cause exists, "each individual layer of information is not to be weighed. Rather the 'laminated total' of the facts available is the source of the justification for a vehicle search." Id. (citation omitted).

Based upon all circumstances present during Overton's stop of Lujan's vehicle, there was sufficient probable cause and exigent circumstances present to qualify for the automobile exception to the Fourth Amendment and effect a warrantless search without violating the Constitution.

Further, Lujan gave consent to search the vehicle after Overton developed probable cause. It is well established that consent serves as an exception to the Fourth Amendment's requirement that searches be supported by warrants. Davis v. United States, 328 U.S. 582, 593-94, 66 S. Ct. 1256, 90 L. Ed. 1453 (1946). But "[i]n relying upon the consensual search exception, the government must prove, by a preponderance of the evidence, that consent was freely and voluntarily given." United States v. Tompkins, 130 F.3d 117, 121 (5th Cir. 1997). Consent is not voluntary if it "was the product of duress or coercion, express or implied," Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), and the Government's burden "is not satisfied by showing a mere submission to a claim of lawful authority." United States v. Villarreal, 963 F.2d 770, 777 (5th Cir. 1992). Moreover, the question of whether consent was voluntary is an issue of fact. Bustamonte, 412 U.S. at 227, 93 S. Ct. 2041.

"Although . . . no single factor is dispositive or controlling," United States v. Mendez, 431 F.3d 420, 429 (5th Cir. 2005), the Fifth Circuit has identified six issues to be considered by courts evaluating the voluntariness of an act of consent: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. United States v. Olivier-Becerril, 861 F.2d 424, 426 (5th Cir. 1988). There is no reason to believe that consent was not freely and voluntarily given in this situation. Defendant Lujan speaks clear English, appeared very cooperative and conversational, Sergeant Overton was not coercive or threatening and indicated several times that Lujan was not required to consent to the search. Therefore, the Court concludes that Lujan freely gave consent for Sergeant Overton to search his vehicle. Once probable cause was established, especially in light of Lujan's initial consent, as well as his later consent to transfer the vehicle to a body shop for inspection, there is no basis to suppress the evidence.

Further, Overton had a reasonable suspicion sufficient to justify the search of the vehicle. The Fourth Amendment's prohibition against unreasonable searches and seizures applies to police conduct that falls short of a full blown arrest, including brief investigatory stops. Terry v. Ohio, 392 U.S. 1, 14, 88 S. Ct. 1868, 1876, 20 L. Ed. 2d 889 (1968). Courts evaluate the legality of traffic stops under the Terry v. Ohio framework. United States v. Jenson, 462 F.3d 399, 403 (5th Cir. 2006) (citing Terry, 392 U.S. 1, 88 S. Ct. 1868). Investigatory stops of vehicles must be supported by reasonable articulable suspicion of criminal activity or a traffic violation in order to withstand constitutional scrutiny. United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 695, 66 L. Ed.

2d 621 (1981). The officer must be able "to articulate something more than inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989). The level of suspicion required for a Terry stop is less demanding than that required to demonstrate the existence of probable cause. Id. at 7, 109 S. Ct. 1581. When evaluating the validity of an investigatory stop such as this the Court must consider "the totality of the circumstances -- the whole picture." Cortez, 449 U.S. at 417, 101 S. Ct. 690.

The Fifth Circuit has promulgated a two-tiered standard for the reasonable suspicion inquiry: "(1) whether the officer's action was justified at its inception, and (2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place." United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). A precise definition of reasonable suspicion is not subject to a formal or neat set of rules. Sokolow, 490 U.S. at 7, 109 S. Ct. 1581. No single fact is determinative; rather, reasonable suspicion is determined by a fact intensive analysis requiring the court to review all the circumstances collectively. U.S. v. Neufeld-Neufeld, 338 F.3d 374, 379 (5th Cir. 2003).

Pertinent to the Court's analysis is the officer's knowledge, expertise and experience. United States v. Brignoni-Ponce, 422 U.S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975); United States v. Sutton, 636 F.2d 96, 99 (5th Cir. 1981). Additionally, officers may develop an objective belief that criminal activity is afoot from reliable information received from a reliable informant. Adams v. Williams, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); U.S. v. Hopes, 286 F.3d 788 (5th Cir. 2002). A law enforcement officer with the requisite level of suspicion is entitled to "stop" a suspect for a reasonable period of time in order to verify or dispel his suspicions. Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229 (1983). Indeed, "so long as a traffic law

infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment . . . ." Goodwin v. Johnson, 132 F.3d 162, 173 (1997) (citing Whren, 517 U.S. at 806, 116 S. Ct. 1769).

Based on all the facts and considering the totality of the circumstances, the court find that Sergeant Overton possessed the requisite level of suspicion to justify an investigatory stop of the Defendant's vehicle. Overton indicated he pulled Lujan over for weaving outside the fog line, a violation of Arkansas traffic law. Thus, the officer was entitled to stop the Defendant's vehicle for a reasonable period of time for a reasonable investigation pursuant to Terry. Generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." Brigham, 382 F.3d at 507. Whether a court will sanction an officer's intrusion on a detained motorist's right to be free from an unreasonable search or seizure is based on the "reasonableness" of the detention. See Ohio v. Robinette, 519 U.S. 33, 40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996) (directing that the "touchstone of Fourth Amendment analysis is reasonableness") (quoting Florida v. Jimeno, 500 U.S. 248, 250, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)). This "requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." Brigham, 382 F.3d at 507. "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." Robinette, 519 U.S. at 39, 117 S. Ct. 417. One of the factors used to make that determination is whether the investigative methods employed are "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."

Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); see also United States v. Valadez, 267 F.3d 395, 398 (5th Cir. 2001); United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1993).

In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Brigham, 382 at 507-08. Computerized license and registration checks are an "efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means." Brigham, 382 F.3d at 511. "Some lines of police questioning before the initiation of a computer check are often reasonable, as they may enable swift resolution of the stop." Id. An officer may ask the driver about the purpose and itinerary of his trip. Id. at 508. Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "detention, not questioning, is the evil at which Terry's second prong is aimed." Id. (quoting United States v. Shabazz, 993 F.2d 431, 436 (5th Cir. 1993)).

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510; see also United States v. Santiago, 310 F.3d 336, 341-42 (5th Cir. 2002); United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); Dortch, 199 F.3d at 200. "[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." Royer, 460 U.S. at 503, 103 S. Ct. 1319. Indeed, "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally

intrusive as to be justifiable on reasonable suspicion." United States v. Place, 462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983). The United States Supreme Court has noted that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable , common sense and ordinary human experience must govern over rigid criteria." United States v. Sharpe, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). The Court further held,

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.

Id. at 686, 105 S. Ct. 1568.

Once stopped, Overton engaged in reasonable questioning from which, based on his experience and training, led him independently to believe the white Ford truck was used for narcotics trafficking. Defendant's transcript of the video-recorded stop indicates that from the time Lujan was pulled over until Lujan consents to an automobile search was approximately eleven minutes. Having reviewed the dashboard camera recording, the Court is satisfied that Sergeant Overton employed the least intrusive means upon Lujan prior to obtaining consent. Thus, the questioning was a reasonable extension of the traffic stop.

Sergeant Overton's stop of Lujan's vehicle was separate and independent of the Government's placement and use of a GPS tracker without a warrant. Because there was probable cause to believe Lujan's vehicle contained contraband, as well as exigent circumstances excusing the failure to apply for a warrant, the warrantless search of Lujan's vehicle was reasonable. The Court further finds Lujan's consent to be valid and voluntarily given. Thus, the evidence discovered in the search of Defendant Lujan's vehicle, particularly the $83,000 and $2500, shall not be

16

suppressed.

*Cell Phone*

Lujan's cell phone was admittedly removed while the vehicle was at the garage. The Arkansas DEA Agent "dumped" the cell phone, meaning that all information from the cell phone was downloaded, and returned the phone to Lujan without seeking a warrant first. Approximately two days later, agents in Mississippi analyzed the information. Defendant seeks to suppress all information downloaded from that cell phone as the fruit of an improper warrantless search.

Because Lujan was never technically "arrested" in Arkansas, the search incident to arrest exception does not apply in this situation. The Government asserts that the search of the cell phone was authorized pursuant to the automobile exception to the Fourth Amendment warrant requirement. See California v. Acevedo, 500 U.S. 565, 579, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991) (allowing police to search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained without first obtaining a warrant).

Although the Fifth Circuit has not extended the automobile exception to cover the warrantless searches of electronic devices, several district courts have allowed such warrantless search as long as there is probable cause to believe the phone contained evidence of a crime. See United States v. Garcia-Aleman, 2010 WL 2635071, *12 (E.D. Tex. June 9, 2010); United States v. Monson-Perez, 2010 WL 889833 (E.D. Mo. Mar. 8, 2010); United States v. James, 2008 WL 1925032, *3-9 (E.D. Mo. Apr. 29, 2008) ("because probable cause existed to believe that evidence of a crime would be found in the cell phone call records and address book, the automobile exception allows the search of the cell phone just as it allows a search of other closed containers found in the vehicle"); United States v. Fierros-Alvarez, 547 F. Supp. 2d 1206 (D. Kan. 2008) (automobile

17

exception justified search of cell phone found in vehicle).

The Government has not, at either the hearing or through briefing, established that Lujan's cell phone contained evidence of a crime, or that there was probable cause to believe such evidence existed on his cell phone. The Government asserts that cell phones have been recognized as tools of the narcotics trade, and that is enough to justify its warrantless search. The Fifth Circuit has recognized that "cell phones contain a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers." United States v. Zavala, 541 F.3d 562, 577 (5th Cir. 2008). Indeed, a cell phone is "similar to a personal computer that is carried on one's person. Id. Thus, there is a reasonable expectation of privacy in this information. Id. Because cell phones contain such a wealth of private information, in this situation, where no probable cause has been established as to Lujan's cell phone, the evidence must be suppressed. Indeed, requiring the government to secure a warrant prior to searching the contents of a properly seized cell phone is typically not overly burdensome in light of the privacy interests at stake. See United States v. Burgess, 576 F.3d 1078, 1090 (10th Cir. 2009) (noting the "vast amounts of diverse personal information" contained in electronic devices).

*Conclusion*

The warrantless search of Lujan's vehicle was not a violation of the Fourth Amendment pursuant to the automobile exception and Lujan's consent. Therefore, Defendant's Motion to Suppress and Dismiss [135] is DENIED. Because probable cause to believe Lujan's cell phone contained evidence of narcotics trafficking was not established in either the hearing or briefing, evidence obtained from that search is suppressed. Defendant's Supplemental Motion to Suppress [145] is GRANTED.

SO ORDERED, this the 10th day of July, 2012.

                                          **/s/ Sharion Aycock**
                                          **U.S. DISTRICT JUDGE**